**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 18-3390

UNITED STATES OF AMERICA

v.

EDWIN PAWLOWSKI,

Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 5-17-cr-00390-001)
District Judge: Honorable Juan R. Sanchez

Submitted Under Third Circuit L.A.R. 34.1(a)
September 28, 2021

Before: AMBRO, KRAUSE, and BIBAS, Circuit Judges

(Opinion filed: March 4, 2022)

Jack J. McMahon, Jr.
139 North Croskey Street
Philadelphia, PA 19103

Counsel for Appellant

Richard P. Barrett
Michelle Morgan
Anthony J. Wzorek
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

Counsel for Appellee

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

A jury convicted Edwin Pawlowski of federal programs bribery, Travel Act bribery, attempted Hobbs Act extortion, wire and mail fraud, honest services fraud, making false statements to the FBI, and conspiracy. The charges stemmed from a scheme in which Pawlowski—then the Mayor of Allentown, Pennsylvania—steered city contracts and provided other favors in exchange for campaign contributions. The District Court imposed a 180-month sentence.

On appeal, Pawlowski argues that (1) there was insufficient evidence to support his convictions, (2) his

inability to recross-examine a Government witness violated the Sixth Amendment's Confrontation Clause, and (3) his sentence is procedurally and substantively unreasonable. We reject each argument and hence affirm.[1]

## I.

We conduct a fresh review for a sufficiency-of-the-evidence challenge. *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009). Our review is, however, "guided by strict principles of deference to a jury's verdict." *United States v. Rosario,* 118 F.3d 160, 162–63 (3d Cir. 1997). We must view the evidence "in the light most favorable to the prosecution," and will affirm the conviction if a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Garner*, 915 F.3d 167, 169 (3d Cir. 2019) (quoting *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424–25 (3d Cir. 2013) (en banc)). "Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges." *Id.* (quoting *Caraballo-Rodriguez*, 726 F.3d at 432).

Pawlowski contests all counts of conviction as lacking sufficient evidence. For our purposes, these counts can be

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

divided into two groups: bribery[2] and false statements. We conclude that the evidence was sufficient to convict on both.

## A.

As to the bribery counts, Pawlowski contends the Government failed to prove an explicit *quid pro quo* necessary to succeed on charges premised on the solicitation or acceptance of campaign funds. Because the parties agree that proof is required, we assume (without deciding) it is.

The "explicit *quid pro quo*" requirement derives from *McCormick v. United States*, 500 U.S. 257 (1991). There, the Supreme Court addressed the complexities in prosecuting an elected official for soliciting or receiving campaign donations. On the one hand, our nation's election campaigns are privately funded, requiring candidates to seek donations from their supporters. *See id.* at 272. And a representative's role is to

[2] The bribery offenses are federal programs bribery, 18 U.S.C. § 666(a)(1)(b); Travel Act bribery, 18 U.S.C. § 1952(a)(3); Hobbs Act extortion, 18 U.S.C. § 1951; wire fraud, 18 U.S.C. § 1343; mail fraud, 18 U.S.C. § 1341; honest services wire fraud, 18 U.S.C. §§ 1343, 1346; and honest services mail fraud, 18 U.S.C. §§ 1341, 1346. Pawlowski was also convicted of conspiracy, 18 U.S.C. § 371, but challenges the sufficiency of the evidence supporting his bribery and conspiracy convictions on the same grounds, arguing only that the overt acts alleged in the conspiracy charge—which also form the basis of his bribery convictions—were not borne out by the evidence. We reject this argument for the reasons discussed below.

further the interests of his or her constituents. Indeed, "[i]t is well understood that a substantial and legitimate reason, if not the only reason, [to contribute to] one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors." *Citizens United v. FEC*, 558 U.S. 310, 359 (2010) (quoting *McConnell v. FEC*, 540 U.S. 93, 297 (2003) (Kennedy, J., concurring in part and dissenting in part)). Thus, as a practical matter, policing elected officials for requesting or receiving campaign funds "open[s] to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures." *McCormick*, 500 U.S. at 272.

But, at the same time, this regime is open to abuse, and our representative system is undermined without restrictions on officials' ability to engage in partisan conduct on behalf of their donors. *See Buckley v. Valeo*, 424 U.S. 1, 26–27 (1976) (per curiam). The public correspondingly has an interest in ensuring its representatives are held accountable for abusing the public trust, even when that abuse occurs in the campaign-finance context. *See United States v. Dozier*, 672 F.2d 531, 537 (5th Cir. 1982) ("Our need to avoid hampering honest candidates who must solicit funds from prospective supporters does not require that the courts abandon this necessary, if troublesome, realm of political maneuver to those who would abuse its opportunities.").

To balance these competing claims, *McCormick* imposed on the Government a heightened burden of proof: an official's solicitation or acceptance of campaign funds is presumed legitimate unless the prosecution establishes an

explicit *quid pro quo*, meaning "an explicit promise or undertaking by the official to perform or not to perform an official act" in exchange for the donation. 500 U.S. at 273. A "vague expectation of future benefits" is not enough. *Dozier*, 672 F.2d at 537. Rather, the evidence, considered as a whole, must show that the official obtained or attempted to obtain campaign contributions "in exchange for specific promises to do or refrain from doing specific things." *See United States v. Farley*, 2 F.3d 645, 651 (6th Cir. 1993) (emphasis omitted) (quoting *United States v. Bibby*, 752 F.2d 1116, 1127 n.1 (6th Cir. 1985)).

At issue in *McCormick* was whether a public official's receipt of alleged campaign funds constituted Hobbs Act extortion "under color of official right." 18 U.S.C. § 1951(b)(2). The Supreme Court has yet to extend *McCormick*'s explicit *quid pro quo* requirement beyond the extortion context. But because the parties agreed to require proof of such an arrangement, we assume without deciding that *McCormick* governs each of the Government's bribery counts, at least where those counts are premised on the solicitation or acceptance of campaign funds. *See United States v. Antico*, 275 F.3d 245, 257 (3d Cir. 2001) (declining to extend *McCormick* to non-campaign donation cases). And contrary to Pawlowski's position, when viewed in the Government's favor, the parties' conversations and conduct (detailed below) establish explicit *quid pro quos*, showing the intent to use his public office to provide specific favors in exchange for political donations.

Pawlowski was convicted of seven bribery sub-schemes, each of which involved a different prospective donor (generally, would-be city contractors). He interacted with

them largely through his political consultants, Michael Fleck and Sam Ruchlewicz. And several favors involved the assistance of the City's Managing Director, Francis Dougherty. In addition to the testimony of Ruchlewicz, Dougherty, and several contributors, the Government introduced surreptitiously taped conversations among Pawlowski, Ruchlewicz, Fleck, and others. This evidence was sufficient to show an explicit *quid pro quo* between Pawlowski and each of the seven prospective donors: (1) Ramzi Haddad; (2) Northeast Revenue Service; (3) Spillman Farmer Architects; (4) McTish, Kunkel & Associates; (5) the Norris McLaughlin law firm; (6) The Efficiency Network; and (7) CIIBER/5C Security. Because the District Court thoroughly recounted the evidence in its opinion denying Pawlowski's Rule 29 motion, *see United States v. Pawlowski*, 351 F. Supp. 3d 840, 851–71 (E.D. Pa. 2018), we set out only a portion of that evidence here.

**1.**

The first contributor, Ramzi Haddad, was developing a property in Allentown. Evidence showed he and Pawlowski agreed that Haddad would contribute to Pawlowski's campaign in exchange for two favors regarding the property: (1) expediting a zoning request; and (2) securing a favorable inspection.

For the first favor, Haddad approached the City's zoning office with a request in early December 2014 and was told it would not be addressed until January 2015. He then spoke with Ruchlewicz. During that conversation, Ruchlewicz asked Haddad to contribute $2,500 to Pawlowski's campaign. He responded by asking for a "gift" from Pawlowski,

explaining that it had to do with a zoning issue. Supp. App. 1131. The two spoke again about a contribution a few days later, at which time Ruchlewicz informed Haddad that he had conferred with Pawlowski about Haddad's need for zoning help, and Pawlowski responded, "[W]hatever [Haddad] want[s, c]onsider it done." *Id.* at 1137. Ruchlewicz also testified that he had brought Haddad's zoning issue to the attention of Pawlowski and Dougherty. Then, in a conversation on December 17, Dougherty told Ruchlewicz that he would direct the City's Zoning Supervisor, Barbara Nemith, to "prioritize her review" of Haddad's request. *Id.* at 1144. Nemith testified that Dougherty told her about Haddad's request and that, but for his inquiry, it would have taken longer to approve. A reasonable jury could find that Pawlowski—acting through Ruchlewicz and Dougherty—pressured Nemith to expedite Haddad's zoning request in exchange for Haddad's $2,500 campaign contribution.[3]

---

[3] Pawlowski submits that he only arranged meetings on Haddad's behalf, and thus did not take an "official action" as required to support his bribery conviction. *See McDonnell v. United States*, 136 S. Ct. 2355 (2016). Because the parties do not argue otherwise, we assume that proof of official acts was required under Pawlowski's statutes of conviction. And Pawlowski is right that "merely setting up a meeting" does not qualify as an official act. *Id.* at 2369 (defining an "official act" as a "focused," "concrete," and "formal exercise of governmental power"). But the evidence here was not so weak. It showed that Pawlowski used his office to facilitate specific official favors for Haddad in exchange for donations; these actions were sufficient to support his convictions. *See id.* at 2370 (an official act occurs where the bribe recipient agrees to

The second favor—concerning a property inspection—came a few months later. During a meeting in May 2015, Pawlowski asked how much Haddad could raise for the former's campaign, to which he responded that he had $35,000 "in [his] pocket for [Pawlowski]." *Id.* at 1267. Haddad then immediately turned the conversation to a city inspection of the property, expressing frustration that a delay had cost him customers as well as concern that the inspector would "[]nit pick [him] again." *Id.* Pawlowski said he was "working" on the issue. *Id.* Three days later, on the morning of the scheduled inspection, Pawlowski discussed Haddad's property with the Director of the City's Office of Building Standards and Safety, David Paulus. Following the inspection, Paulus emailed Pawlowski to tell him it had gone well. A month later, on the day before Pawlowski's campaign-contribution deadline, Pawlowski expressed frustration about Haddad's fundraising, stating that he had provided "so much help for [Haddad]" and had "ben[t] over backwards for [him]." *Id.* at 1291–92.

Given this evidence, a reasonable jury could find that Pawlowski used his influence to pressure city officials into expediting Haddad's zoning request and securing him a favorable property inspection in exchange for campaign funds.

**2.**

The second contributor, Northeast Revenue Service, sought a contract to serve as the City's collector of delinquent real estate taxes. In an effort to obtain the contract, Northeast

---

use his or her "official position to exert pressure on *another* official to perform an 'official act'" (emphasis in original)).

in October 2013 made a presentation to Pawlowski. He remarked during it that the owner of the firm then holding the contract—Michelle Portnoff—had "done nothing for [him]." App. 394. After Northeast submitted its contract proposal, Pawlowski called Sean Kilkenny—who was working to obtain the contract for Northeast and who had been at the presentation—and asked him for a campaign contribution. Kilkenny testified that he then contributed $2,500, as he "felt pressure" to do so. *Id.* at 400.

Shortly thereafter, while Northeast's proposal was still pending, Ruchlewicz called Kilkenny and asked for tickets to a Philadelphia Eagles playoff game for himself and Pawlowski. Northeast obtained the tickets and, on the day of the game, Kilkenny joined Pawlowski and Ruchlewicz for dinner at a Philadelphia steakhouse. At dinner, Ruchlewicz remarked in Pawlowski's presence that Northeast's proposal "looked good." *Id.* at 404. Pawlowski and Ruchlewicz did not offer to pay for the dinner or the tickets.

In January 2014, Pawlowski spoke with the City's Finance Director, David Strathearn, about the contract. Pawlowski stated that he needed Northeast to be awarded the contract, and that he was concerned the committee responsible for the decision was going to select another firm. Strathearn testified that he considered this to be a direction from Pawlowski, prompting the former to intervene with the committee to alter its selection methodology so Northeast would be picked rather than the firm the committee had previously favored. As a result, Northeast got the contract.

Given this evidence, a reasonable jury could find an explicit *quid pro quo*, with Pawlowski helping the firm obtain

the revenue contract in exchange for campaign contributions, Eagles tickets, and dinner for Pawlowski and Ruchlewicz.

**3.**

The third contributor, Spillman Farmer, is an architectural firm that sought a contract to design and construct pools for the City. The evidence at trial showed an explicit *quid pro quo* for Pawlowski to steer the contract to Spillman in exchange for campaign contributions.

Prior to interceding in the contract-selection process, Pawlowski and Dougherty spoke about the firm. Pawlowski told Dougherty that it "would be great to get [Spillman] on board . . . for some of our pool work," and informed him that the firm "would be [a] campaign contributor[]." Supp. App. 223. Dougherty then told the City's Superintendent of Parks, Richard Holtzman, that Pawlowski wanted Spillman to receive the pools contract. But after reviewing proposals from it and other potential contractors, the evaluation committee did not prefer Spillman. When Dougherty learned this, he asked Holtzman "[t]o take another look at Spillman," which, Holtzman testified, "pressure[d]" him to favor it. App. 1891–92.

On looking into the matter, Holtzman learned that one of Spillman's references had provided the committee a negative review. He passed this information to Dougherty; the latter told Pawlowski, who in turn asked Dougherty to speak with Ruchlewicz. After their conversation, Ruchlewicz called a partner at Spillman, Joseph Biondo, advising him about the negative reference and asking him to provide another reference as soon as possible. Ruchlewicz told Biondo that "everybody

likes you guys and you're the low bid." Supp. App. 1244. Biondo responded "okay," thanked Ruchlewicz for the information, and agreed to provide a new reference. *Id.* at 1244–45. Spillman was awarded the contract.

Before officially signing the contract, Pawlowski called Biondo and asked him for a $2,700 campaign contribution. Biondo responded that he would have to run that request "up the flagpole," meaning he would have to discuss it with the other partners. App. 2049. After the call ended, Pawlowski expressed frustration to Ruchlewicz, telling him that Biondo "[b]etter run it up the flagpole fairly quick." Supp. App. 1230. Pawlowski's staff then reached out to Biondo again, shortly before Pawlowski's fundraising deadline, requesting a contribution. Though Pawlowski did ultimately sign the pools contract without receiving a contribution from Spillman, he did so only after his fundraising deadline had passed and on the same day as his interview with the FBI.

From this evidence, a reasonable jury could find that Pawlowski intended to secure the contract for the firm in exchange for a campaign donation, and that Spillman merely failed to live up to its end of the bargain.

**4.**

The fourth contributor, McTish, Kunkel & Associates, is an engineering firm that sought a street-improvement contract. One of the firm's engineers, Matthew McTish, testified that, based on conversations he had with Pawlowski—in which Pawlowski would discuss both contributions to his own campaign and City contracts—McTish did not believe he

could obtain contracts from the City unless he contributed to Pawlowski's campaign.

During a conversation in December 2014, Ruchlewicz informed Pawlowski that he had "found . . . a project" for the firm—specifically, the street-improvement contract. *Id.* at 1133. Pawlowski expressed his approval and agreed with Ruchlewicz's suggestion that he "hit [McTish] up" for his holiday party campaign fundraiser. *Id.* Five days later, Ruchlewicz called McTish and told him that the Mayor was "very[,] very happy" that the firm would be donating about $2,500, and that as soon as the street-improvement contract came before Pawlowski, he would "give it the rubber stamp, sign it, seal it, [and] it will be yours." *Id.* at 1135. McTish and his brother then donated $2,250.

The firm did not, however, receive the street-improvement contract. At a meeting a few months after the donation, Ruchlewicz reassured McTish that would occur and there would be more work for the firm on bridges in Allentown. Later in the meeting, McTish spoke with Pawlowski, who asked McTish for additional fundraising help. Ruchlewicz later asked McTish if he and Pawlowski were "all squared away" and had "talked about bridges." *Id.* at 1221. McTish responded yes to both.

From this, a reasonable jury could find that Pawlowski and McTish agreed—through Ruchlewicz—that Pawlowski would obtain a contract for McTish in exchange for campaign contributions, and Pawlowski failed to follow through.

**5.**

The fifth contributor, Norris McLaughlin, is an Allentown law firm. Evidence showed that Pawlowski solicited campaign contributions from it and Scott Allinson, a partner at the firm,[4] in exchange for Pawlowski's agreement to steer a Parking Authority contract its way.

At trial the Government introduced several recorded conversations about the Parking Authority scheme. In December 2014, Allinson complained to Ruchlewicz that the firm had "been unbelievably supportive in the past and now, you know, the work's going everywhere . . . but to our shop." *Id.* at 1235. The men spoke again two days later. Ruchlewicz told Allinson that the City's current Parking Authority Solicitor would be fired and a Norris McLaughlin partner—Richard Somach—would take his place. But he informed Allinson that the firm would need to "do something for the mayor's holiday party." *Id.* at 1239. Allinson responded that he was willing to write a check.

The next month, Allinson complained to Fleck and Ruchlewicz about "sore feelings" at the firm. *Id.* at 1168. He told them that the Parking Authority job could "begin to fix all of those little sore feeling issues and get the checkbooks back out." *Id.* Ruchlewicz went back to Pawlowski and informed him that Allinson was having doubts about whether Norris McLaughlin would support his campaign. Pawlowski

[4] Allinson was tried alongside Pawlowski and was convicted of conspiracy and federal programs bribery. His appeal is pending before us, C.A. No. 19-3806, and was consolidated with this matter for disposition purposes by Clerk's Order entered January 29, 2020. That appeal we address in a separate opinion.

responded, "I'm not gonna make Somach solicitor or anything. Screw it all." *Id.* at 1297. Ruchlewicz replied that he and Fleck would "get everything fixed." *Id.*

Allinson, Ruchlewicz, and Fleck met again a few days later. Allinson told them that, if Norris McLaughlin were to get the Parking Authority contract, he would have "the full stack of cash on [his] side to do with it what [he] need[s] to do, annually." *Id.* at 1179. Shortly thereafter, Ruchlewicz informed Pawlowski that Allinson had brought a check—which Ruchlewicz called "[i]nstallment number one"—to one of Pawlowski's fundraisers. *Id.* at 1204. When Ruchlewicz later asked Pawlowski about the status of the Parking Authority position, Pawlowski assured him, "I'm working on it." *Id.* at 1214. Ruchlewicz told Pawlowski that Allinson would need to get the credit for bringing in the contract, as he controlled the firm's PAC money. Pawlowski responded, "I got you." *Id.* at 1215.

Pawlowski then sought $25,000 in campaign contributions from the firm. Allinson complained to Ruchlewicz that this was "a lot of fucking money when you're getting absolutely zero back from the city." *Id.* at 1247. Ruchlewicz responded, "Well, we'll have to change that. The mayor will." *Id.*

Norris McLaughlin contributed $17,300 to Pawlowski's campaign. After notifying Pawlowski of the firm's contribution, Fleck asked if they could now appoint Somach as Parking Authority Solicitor, and the men discussed options for getting the current Solicitor to leave the position.

From this, a reasonable jury could find an explicit *quid pro quo* for Pawlowski to secure the Parking Authority job for a Norris McLaughlin partner in exchange for campaign funds.

**6.**

The sixth donor, The Efficiency Network ("TEN"), is a company that sought a City contract to provide streetlights. Dougherty testified that Pawlowski wanted TEN to receive contracting work from the City because one of TEN's principals, Patrick Regan, was politically influential. To ensure that TEN would qualify for the streetlight contract, Pawlowski and Ruchlewicz asked Regan to provide language the City could incorporate into a request for qualifications ("RFQ") issued to prospective contractors. After Pawlowski left the meeting, Ruchlewicz told Regan that the deal was "lined up." *Id.* at 1164. Later in the same meeting, Ruchlewicz told Regan that Pawlowski wanted to invite him to a campaign fundraiser and "was hoping" for a $2,500 contribution, noting that the City's contractors needed "to give back a little bit." *Id.* at 1166. Regan agreed.

Thereafter, one of TEN's political consultants, Jim Hickey, provided Dougherty language for the City's RFQ for the streetlight contract. Dougherty testified that, at Pawlowski's request, he directed the City's Public Works Director to incorporate this language into the RFQ. But the contract evaluation committee refused to do so. This upset Pawlowski, who asked Dougherty who needed to be fired.

The same day, Pawlowski phoned Regan and asked for TEN to sponsor a state conference of the Pennsylvania

Municipal League to be held in Allentown. TEN obliged, donating $5,000 for the conference.

Just weeks later, TEN submitted its proposal to the City, but it arrived late. Dougherty informed Ruchlewicz, who brought it to Pawlowski's attention, stating that this problem had been "resolved." *Id.* at 1213. Dougherty testified that he permitted the late filing.

Before the streetlight contract was awarded, Fleck spoke with Pawlowski about campaign contributions from TEN. Fleck told Pawlowski that, given the pending contracting process, it "would be a good time to ask" for an additional contribution from Regan. *Id.* at 1255. Pawlowski agreed. Later that day, he instructed Ruchlewicz to seek contributions from TEN through its political consultant, Hickey. Ruchlewicz obliged, asking Hickey to have Regan donate to Pawlowski, and reminding Hickey that "TEN's gonna get some street lights." *Id.* at 1225. When Hickey stated, "[L]et's just get the deal done first," Ruchlewicz responded, "The deal's done." *Id.* at 1226. Less than two months later, TEN was awarded the contract.

Given the above, a reasonable jury could find an explicit *quid pro quo* for Pawlowski to secure the streetlight contract for TEN in exchange for campaign contributions and the contribution to the Pennsylvania Municipal League.

**7.**

The seventh and final contributor, CIIBER/5C Security, is a company that sought a contract to provide cybersecurity for the City. Dougherty testified that Pawlowski wanted

CIIBER/5C Security to receive contracting work for the City because its principal, Jack Rosen, was wealthy and politically influential, and thus a valuable fundraiser. Pawlowski tasked Dougherty with finding Rosen contract work. Dougherty and Pawlowski decided on a cybersecurity contract.

Pawlowski and Ruchlewicz met with Rosen in February 2015, and the three discussed Rosen making a campaign contribution to Pawlowski. They then discussed the cybersecurity contract for CIIBER/5C Security. Pawlowski told Rosen, "[W]e're going to do the contract." *Id.* at 1191. Pawlowski explained to him that the contract had to be for no more than $19,000; otherwise the City charter would require it to be put out for competitive bidding. Rosen explained that $19,000 was acceptable because, even if he lost money on the contract, it would get his company a foothold in Pennsylvania.

At a meeting a few months later, Pawlowski and Rosen again discussed the cybersecurity contract for CIIBER/5C Security. Pawlowski noted that it was "lined up." *Id.* at 1261. The conversation then turned to fundraising for Pawlowski. He asked Rosen to raise $100,000 in New York, and Rosen responded, "I think we will raise you some money." *Id.* at 1264.

Given the above, a reasonable jury could find an explicit *quid pro quo* for Pawlowski to secure the cybersecurity contract for CIIBER/5C Security in exchange for campaign contributions raised by Rosen.

**B.**

Pawlowski was also convicted of several counts—

Counts 49 through 55 of the indictment—for making materially false statements to the FBI, in violation of 18 U.S.C. § 1001. To establish such a violation, the Government needed to prove that: (1) Pawlowski made a statement or representation; (2) it was false; (3) it was made knowingly and willfully; (4) it was material; and (5) it was made in a matter within the federal government's jurisdiction. *United States v. Moyer*, 674 F.3d 192, 213 (3d Cir. 2012). Pawlowski focuses his attention only on the false-statement prong, arguing that the Government failed to present sufficient evidence that certain of his statements were untrue. Again we disagree.

Counts 49 and 50 charge Pawlowski with falsely stating that he "stayed out of the contract bidding process" and "did not try to influence the awarding of contracts from the City . . . to particular vendors." Indictment at 59. The evidence recounted above is sufficient to show that Pawlowski repeatedly intervened in the contracting process to steer contracts toward vendors from whom he expected campaign contributions.

Count 51 charges Pawlowski with falsely stating that "he did not tell the . . . City Solicitor to whom to award City . . . contracts, when he knew that he did tell the [C]ity [S]olicitor to award contracts to certain law firms and to deny contracts to certain law firms." *Id.* A former City Solicitor, Jerry Snyder, testified that Pawlowski directed him to award representation on a certain lawsuit to a different law firm than the one Snyder had already chosen for the suit.

Count 52 charges Pawlowski with falsely stating that he "never used a list of vendors and the amount of money they have received in contracts from the City . . . to determine how

much money those vendors should contribute to his political campaign." *Id.* Both Dougherty and Ruchlewicz testified that Pawlowski did so on multiple occasions.[5]

Count 53 charges Pawlowski with falsely stating that he had "never taken anything of value from anyone bidding on a City . . . contract, when he knew that he did take a free meal and tickets to a Philadelphia Eagles playoff game from a company bidding on a [C]ity contract." *Id.* Pawlowski objects that while Northeast Revenue gave him the Eagles tickets, he neither requested nor used them. But the evidence, recounted above, was sufficient to show that he requested the tickets through Ruchlewicz and did not offer to contribute toward a steakhouse dinner paid for by representatives of the firm.

Count 54 charges Pawlowski with falsely stating that he never took "any official action to benefit . . . Haddad." *Id.* As discussed, the evidence was sufficient for a jury to find that Pawlowski took two official actions on the part of Haddad—pressuring City officials to expedite his zoning request and securing him a favorable property inspection.

Finally, Count 55 charges Pawlowski with falsely stating that he "had no role in selecting or not selecting the law

---

[5] Pawlowski contends that during his FBI interview he "corrected his previous comments regarding use of vendor lists and made clear he did use these for political fundraising purposes." Pawlowski Br. 48. But a reasonable jury could have concluded that Pawlowski's initial statement was knowingly false and that he only corrected it after the interviewing FBI agent informed him the agency possessed tapes of his conversations.

firm Stevens [&] Lee for contracts with the City." *Id.* In addition to the various pay-to-play schemes described above, the Government also charged Pawlowski in connection with his solicitation of campaign funds from attorneys at Stevens & Lee. The District Court acquitted him of these charges, holding that the Government's evidence showed only that Pawlowski solicited those funds by offering to undertake "some unspecified future action" on the firm's behalf rather than a specific official act as required by *McCormick*. App. 45. But the jury heard Pawlowski's complaint that he had "given [the firm] millions of dollars of work," Supp. App. 1066, and Dougherty testified that Pawlowski told him the firm "fell out of favor" with him due to its lack of campaign contributions, *id.* at 253. It was thus entitled to find that Pawlowski had a role in obtaining contracts for the firm—even if he failed specifically to offer it contracts in exchange for donations—and steered work away from the firm.

**III.**

Pawlowski also challenges his inability to recross-examine Ruchlewicz, who was a cooperating witness and testified on behalf of the Government at trial.

The Sixth Amendment's Confrontation Clause requires that defendants be given the opportunity to confront and cross-examine the prosecution's witnesses. *Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 380 (3d Cir. 2018) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987)). But the right to recross-examination is more limited. A defendant is entitled to recross "[w]hen material new matters are brought out on redirect examination." *United States v. Riggi*, 951 F.2d 1368, 1375 (3d Cir. 1991). And where a district court improperly denies recross-examination, we still

will affirm if, "assuming that the damaging potential of the [proposed recross-examination] were fully realized, [we] might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* at 1376 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Pawlowski argues the District Court erred by denying him the chance to recross-examine Ruchlewicz regarding statements made during a recorded conversation among Ruchlewicz, Fleck, and a person who was—unbeknownst to Ruchlewicz and Fleck at that time—an undercover Government agent.[6] During that conversation, Fleck made certain statements to the undercover agent regarding Pawlowski that could be considered exculpatory because they indicate he would not take bribes. For example, Fleck told the undercover agent that Pawlowski "is not greedy" and that "you don't have to give [him] a dime" so long as the prospective project is "the right thing to do." Supp. App. 735. Although Ruchlewicz and Fleck would both later agree to cooperate with the Government and record their conversations with Pawlowski and his prospective donors, neither was an informant at the time of this conversation.

---

[6] Pawlowski's brief notes that he sought recross-examination as to "eight specific areas where there was either new testimony or new exhibits" introduced by the Government on redirect. Pawlowski Br. 21. But he only provides argument as to one area—the recorded conversation among Ruchlewicz, Fleck, and the undercover agent. And Pawlowski waived his request as to other areas during oral argument in the District Court. Accordingly, we do not consider those areas.

On cross-examination of Ruchlewicz, Pawlowski's counsel introduced these statements by Fleck. On redirect, the Government sought to explain their potentially exculpatory content by asking Ruchlewicz whether he and Fleck "trust[ed]" the undercover agent at the time of the conversation. App. 1607–08. Ruchlewicz testified that they did not. Pawlowski's counsel then sought recross-examination to undermine Ruchlewicz's assertion. The trial judge denied the request, concluding that recross-examination as to this issue was not required because it was not a material new matter.

We need not determine whether this decision was in error. Even if assumed so, it was harmless beyond a reasonable doubt.

In determining whether an error is harmless, we assess "the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case." *Riggi*, 951 F.2d at 1376. Considering these factors, we first note that the potentially exculpatory statements on which Pawlowski sought to question Ruchlewicz further were made by Fleck—not Ruchlewicz. Indeed, at first Pawlowski objected to the Government's asking Ruchlewicz whether he trusted the undercover agent, arguing that it was irrelevant because it was Fleck who made the statements. Yet Pawlowski never called Fleck himself to testify about those statements and whether he trusted the undercover agent when he made them. It is difficult to conclude Pawlowski was harmed by the denial of recross-examination of Ruchlewicz—who was merely present when Fleck make the potentially exculpatory

statements—when his counsel had the opportunity to examine Fleck but declined to do so.[7]

Moreover, both the extent of Pawlowski's opportunity to cross-examine Ruchlewicz and the overall strength of the Government's case support the conclusion that any error was harmless. Pawlowski's counsel cross-examined Ruchlewicz extensively over multiple trial days. And, as we only partially recounted above, the Government introduced extensive evidence of Pawlowski's guilt, including not only the testimony of Ruchlewicz but that of Dougherty and several of the contributors, in addition to Pawlowski's own recorded statements. Thus, while Ruchlewicz was no doubt an important witness for the prosecution, we decline to vacate Pawlowski's convictions on this ground.

**IV.**

Finally, Pawlowski contends that the District Court's imposition of a 180-month sentence was procedurally and substantively unreasonable. We generally review both for abuse of discretion. *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc). His procedural objections, however,

---

[7] The Government also argues that Pawlowski "did not attempt to call Ruchlewicz as his own witness during the defense case." Gov't Br. 44. But in his motion for reconsideration of the District Court's oral ruling denying recross-examination, Pawlowski did request in the alternative that Ruchlewicz be made available to testify in his case-in-chief. The District Court did not directly address this alternative request. That still does not change our conclusion that any error in barring further questioning of Ruchlewicz was harmless.

we review for plain error, as Pawlowski failed to raise these challenges at the time of sentencing. *United States v. Flores-Mejia*, 759 F.3d 253, 257–58 (3d Cir. 2014) (en banc).

In evaluating the reasonableness of Pawlowski's sentence, we must first "ensur[e] that the [D]istrict [C]ourt committed no significant procedural error, such as . . . failing to consider the [18 U.S.C] § 3553(a) factors . . . or failing to adequately explain the chosen sentence." *Tomko*, 562 F.3d at 567 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). If the sentence is procedurally sound, we then consider if it is substantively reasonable given "the totality of the circumstances." *Id.* A sentence will not be held unreasonable unless "no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the [D]istrict [C]ourt provided." *Id.* at 568. And if the sentence is within the applicable Guidelines range, we may presume it is reasonable. *Rita v. United States*, 551 U.S. 338, 347 (2007).

Pawlowski contends that the District Court erred procedurally by failing to consider meaningfully two of the § 3553(a) factors: (1) his history and characteristics, including many character letters submitted by members of the community, and (2) the need to avoid unwarranted disparities among defendants who have been found guilty of similar offenses. It adequately considered both.

First, as to Pawlowski's history and characteristics, the District Court noted that it reviewed, "with extraordinary care, the 111 letters that were submitted on behalf of Mr. Pawlowski." App. 2568–69. Moreover, it heard—over the course of several hours at sentencing—character testimony from approximately 45 witnesses, which it summarized as

attesting to "the great things and the great deeds that Mr. Pawlowski has done for the [C]ity, and . . . his character." *Id.* at 2569.

Second, as to sentencing disparities, the Court noted that it had considered a chart prepared by Pawlowski's counsel showing that many defendants convicted of similar offenses received between five- and ten-years' imprisonment. The Court also noted that it considered other sentences—higher than those cited by Pawlowski—imposed in other cases. In sum, it is clear from the record that the Court considered the appropriate § 3553(a) factors.[8]

As to substantive reasonableness, we note that the 180-month sentence is presumptively reasonable, as it falls within the applicable Guidelines range, 151 to 188 months. While Pawlowski is a first-time offender and has significant community and family support, the District Court reasonably concluded that his offense was very serious, "strik[ing] at the core of our democracy." *Id.* at 2577. It held that a sentence near the top of the Guidelines range was necessary to deter

---

[8] Pawlowski also contends that the Court improperly considered two additional facts: (1) that his conduct constituted an abuse of power, which he notes was already factored into his Guidelines range; and (2) that he did not show remorse for his conduct. Neither is inappropriate. Pawlowski cites no authority—and we can find none—precluding a sentencing court from considering a fact at the § 3553(a) stage merely because that fact is also relevant to the Guidelines calculation. And sentencing courts routinely consider a defendant's lack of remorse. *See, e.g.*, *United States v. King*, 454 F.3d 187, 195 (3d Cir. 2006).

others from abusing the public trust in a similar fashion. We discern no abuse of discretion in this decision.

* * * * *

The Government's case against Pawlowski was strong. Its evidence showed a man eager to influence and be influenced if it would help him fund his political campaigns. While we acknowledge the practical realities of public office, the jury was entitled to find that Pawlowski's conduct—that is, his promises and efforts to perform specific official favors in exchange for donations—crossed into the criminal. We agree that his sentence was quite substantial. But seeing no error, we affirm.